**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO.: 1:24-CR-63** |
| | : | |
| **Plaintiff,** | : | **JUDGE MCFARLAND** |
| | : | |
| **v.** | : | |
| | : | **SENTENCING MEMORANDUM OF** |
| | : | **THE UNITED STATES** |
| **KYLE TENNYSON,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

On December 3, 2025, the defendant, Kyle Tennyson, will stand before this Court after having pled guilty to one count of Attempted Coercion and Enticement in violation of 18 U.S.C. § 2422(b). Tennyson pled guilty pursuant to a Plea Agreement under Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure where the parties left the sentence to be determined to the Court. For the reasons set forth below, the United States recommends that the Court sentence Tennyson to a 151-month term of imprisonment, followed by a significant term of supervised release, a mandatory $100 special assessment pursuant to 18 U.S.C. § 3013, and a mandatory $5,000 special assessment pursuant to 18 U.S.C. § 3014 for the Justice for Victims of Trafficking Act of 2015.

## BACKGROUND

On April 30, 2024, Kyle Tennyson, a registered sex offender, was using the social media application "Kasual" when he sent a direct message to another user who identified herself as "Carlee." Within the first several messages, Tennyson asked how Carlee felt about one-night stands, to which Carlee indicated that she had never done something like that and that she was inexperienced. Shortly thereafter, Carlee disclosed to Tennyson that she was only 15 years old and

lamented that "everyone stops talking to [her]" upon learning her age. In response, Tennyson did not terminate the conversation but, instead. explained "It's just extremely risky for a guy to do anything with you sadly :/ I hate the law." Tennyson then went on to add that "[u]gh, it definitely does sound like a situation where it could be a lot of fun to hang out. It's just so dangerous. I would be screwed if anything happened." To this, Carlee indicated that she would not tell on him. Tennyson then tried to get Carlee to continue their discussion on Snapchat, noting that it "would be safer to talk about it" on that platform. When Carlee indicated that her parents would not let her have Snapchat, Tennyson continued the chat on Kasual but indicated he could only give her the basic points "in case the app is flagging things." He then explained his concerns with talking to the Carlee as "[b]asically, I was caught for this a few months ago and am currently going through the legal system … Girl on bumble said she was 18. She wasn't. Parents found out. I got screwed."

Carlee then suggested that they exchange phone numbers so they could continue their conversation over text message instead. Tennyson expressed his concern that this could be a "setup" and requested that Carlee send him a picture of herself touching her nose with her pinky finger. When Carlee responded with a picture of herself touching her nose with her index finger, Tennyson objected, stating "[a]nd I gotta be picky about that pic :p … I actually said pinky finger." He further explained "I feel bad, but it's the ridiculousness of it that makes it able to verify you're real… There's a lot of pics with index finger touching nose out there because a lot of people ask for that, so scammers know to find those pics." As a result, Carlee sent him the requested photo of herself.

To further ensure that Carlee was the 15-year-old-girl she purported to be and not law enforcement, Tennyson continued to set up tests for her, including requiring her to send additional

photographs of herself and her location.  As Carlee grew frustrated with the increased demands, Tennyson apologized and explained with each new request that he had to be "so cautious."

Throughout the conversation, Carlee disclosed the fact that she was only 15 years old three separate times. Despite this, Tennyson continued to seek out and arrange a sexual encounter with Carlee, asking whether she "finger[s] herself" and how "small/large the opening is." Tennyson even requested that she send him a picture of her "spreading it out so I can see how big it is."

In addition to explicitly stating her age, Carlee made age-related comments, such as mentioning her inexperience or asking Tennyson to explain what he planned to do with her so she could "research" and learn about it in advance. Instead of ending the conversation, Tennyson continued to demonstrate his interest in having sex with her by telling her what sexual activities he had in mind, proposing different sexual positions for her to look up, and ensuring that her parents did not have access to her hotel room.

As a final condition, Tennyson told Carlee that "[w]hen I get there, to be safe, I will let you know I'm there, then I'd like to see you walk out the front door before I come to the door." When Carlee expressed frustration at yet another demand, Tennyson apologized and explained that he was "really nervous" and that he wanted to meet her outside or in the lobby because "[t]here's always a chance that I could knock, door opens and cops come out." He added "I hope you can understand that there's so much at stake for me here if this goes south." Carlee expressed her own concerns that Tennyson could kidnap her outside the hotel, to which Tennyson replied, "I can give you literal proof that I will not kidnap you." He then sent a picture of his left leg with an ankle monitor along with the message: "[t]his is a tracker on my ankle. If I try to kidnap you, they'll know where I am instantly. I'm also taking a huge risk sharing this with you. I would be destroying

my life if I kidnapped you…" In response, Carlee agreed she would meet him outside the hotel when he arrived.

Within hours of when they first started talking to each other, Tennyson drove nearly two hours to the hotel where Carlee told him she was staying. Ultimately, Carlee was not a 15-year-old girl but, rather, an undercover Task Force Officer with Homeland Security Investigations. Once he arrived at the hotel lobby, Tennyson was arrested with a grocery bag containing an open box of 36 condoms in hand.

Shortly thereafter, on June 5, 2024, Tennyson was indicted with one count of Attempted Coercion and Enticement of a Minor to Engage in Sexual Activity in violation of 18 U.S.C. § 2422(b) and one count of Penalties for Registered Sex Offenders in violation of 18 U.S.C. § 2260A. Just over a year later, on June 11, 2025, Tennyson pled guilty to the single count of Attempted Coercion and Enticement of a Minor to Engage in Sexual Activity pursuant a Plea Agreement under Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure.

Following Tennyson's plea hearing, the Court ordered the preparation of a Presentence Investigation Report (PSR) and scheduled the matter for sentencing on December 3, 2025.

## <u>LEGAL STANDARD</u>

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).

Then, the Court is required to consider the sentencing factors outlined in 18 U.S.C. § 3553(a). These factors include the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) . . . the sentencing range established . . . [by the Guidelines];

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in effect on the day of sentencing[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Court should impose a sentence sufficient but not greater than necessary to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *See* 18 U.S.C. § 3553(a).

## **ARGUMENT**

### **A. Sentencing Guidelines Calculation**

The United States agrees with the Guidelines calculation set forth in the PSR, which gives a Guidelines imprisonment range of 121 to 151 months, based on a total offense level 32 and criminal history category I. While Tennyson previously objected to the application of the enhancement for being a repeat and dangerous sex offender against minors under U.S.S.G.

§ 4B1.5(b) following the initial PSR, Tennyson appears to agree with Probation's calculation and finding of a Guideline range of 121 to 151 months in his sentencing memorandum. (*See* Doc. #41, #128). Accordingly, the Guideline calculation provided in the PSR is the appropriate calculation and there are no remaining objections to be resolved.

**B. A Review of the 18 U.S.C. § 3553(a) Factors Supports a Significant Sentence**

Once the Court has calculated the advisory sentencing guideline range, the Court must next consider the sentencing factors set forth in § 3553(a) in imposing a sentence that is "sufficient, but not greater than necessary, to comply with the purposes of sentencing." *United States v. Massey*, 663 F.3d 852, 860-61 (6th Cir. 2011). Due deference is accorded to the sentencing judge, who "is in the superior position to find facts and judge their import under section 3553(a) in the individual case." *Gall*, 552 U.S. 38 at 51 (citations omitted). Among the relevant purposes of sentencing is the need for the Court's sentence to reflect the seriousness of the defendant's criminal conduct, to promote respect for the law, to provide just punishment for the offense, and to deter future criminal conduct. A review of the § 3553(a) factors shows that the government's recommended sentence of 151 months' imprisonment followed by a significant period of supervised release is the appropriate sentence in this case.

1. Nature and Circumstances of the Offense; Seriousness of the Offense; and History and Characteristics of the Defendant.

The nature and circumstances of the offense weigh in favor of a significant prison sentence. Tennyson met an individual online whom he believed to be a 15-year-old girl. Instead of ending the conversation when he learned her age, Tennyson went to great lengths to ensure that he could still arrange a one-night stand with the teenager without getting caught. Tennyson then followed through on that plan, driving nearly two hours to show up at the hotel where he believed the minor was staying with condoms in hand. Upon arrest, Tennyson's phone was seized and a forensic

6

review of his phone revealed multiple conversations where Tennyson discussed his past addiction to child pornography, two additional conversations with minors, and multiple photos and videos that were considered "age questionable." Further, at the time Tennyson committed this offense, he had already been a registered sex offender for nearly ten years and was awaiting (and is still awaiting) trial in Delaware County, Ohio case 23CR-I-09-0514, for his alleged violations of six counts of Unlawful Sexual Contact With A Minor and four Counts Of Pandering Sexually Oriented Matter Involving a Minor or Impaired Person (hereinafter, the "Delaware County Case").

Thus, while the Guidelines calculation provides a range of 121 to 151 months' imprisonment, this does not capture the full offense conduct. As noted above, in addition to the count for Attempted Coercion and Enticement of a Minor to Engage in Sexual Activity in violation of 18 U.S.C. § 2422(b), Tennyson was indicted on a second count for Penalties for Registered Sex Offenders in violation of 18 U.S.C. § 2260A, which carries with it a mandatory term of 10 years' imprisonment that would run *consecutive* to the offense charged in Count One. Accordingly, had the government maintained both of these charges against Tennyson, the statutory minimum penalties associated with both of these counts would have required a minimum sentence of at least 20 years of imprisonment. Ultimately, the parties negotiated a Plea Agreement to the single count of Attempted Coercion and Enticement of a Minor to Engage in Sexual Activity, meaning that Tennyson is only facing the statutory minimum penalty set forth in 18 U.S.C. § 2422(b). While the government stands by this agreement, Tennyson's status as a registered sex offender remains relevant conduct for the Court's consideration and further supports a sentence to the top of the Guideline range of 151 months.

Here, the government expects that the defense will ask the Court for leniency due to the lack of a "real victim" because the 15-year-old was actually an undercover detective. The Court

should decline any such request for several reasons. The first, and most important, of which is the fact that Tennyson believed he was communicating with a 15-year-old and not an undercover. As detailed above, Tennyson's messages make clear that he knew that there was a risk that this could be a sting operation and wanted to ensure that he was truly talking to a 15-year-old. Simply put, Tennyson's intent to have sex with a 15-year-old is all that matters.

Another reason to reject any such call for leniency is found by looking to the legislative history for 18 U.S.C. § 2422(b). In discussing the need for mandatory-minimum sentences for crimes such as the one committed by Tennyson, Congress specifically addressed the null effect on an offender's culpability when the object of the enticement is an undercover officer instead of a child:

> The increased mandatory minimum sentences are responsive to real problems of excessive leniency in sentencing under existing law. For example, the offenses under chapter 117 of title 18, United States Code, apply in sexual abuse cases involving interstate movement of persons or use of interstate instrumentalities, such as luring of child victims through the Internet. **Courts all too frequently impose sentences more lenient than those prescribed by the sentencing guidelines in cases under chapter 117, particularly in situations where an undercover agent rather than a child was the object of the enticement. Yet the offender's conduct in such a case reflects a real attempt to engage in sexual abuse of a child, and the fact that the target of the effort turned out to be an undercover officer has no bearing on the culpability of the offender, or on the danger he presents to children if not adequately restrained and deterred by criminal punishment.** Likewise, courts have been disposed to grant downward departures from the guidelines for child pornography possession offenses under chapter 110, based on the misconception that these crimes are not serious.

H.R. Conf. R. No. 108-66, 2003 U.S. Code Cong. & Admin. News 683, 685, Joint Explanatory Statement at 51 (Apr. 9, 2003) (commenting on Title 1 § 103) (emphasis added).

These statements reflect Congress's intent to treat sexual predators who entice minors the same, regardless of whether there is an actual victim. The justification for this is simple: individuals, like Tennyson, who believe they are enticing a child, but are really conversing with an undercover officer posing as a child, pose the same level of danger to the community as those

who are victimizing actual children. As such, a sentence of 151 months' imprisonment would also comport with Congress' intent to impose lengthy sentences for child sex offenses, regardless of whether there is an actual victim.

Moreover, Tennyson's history and characteristics present further aggravators in this case. In some cases, a defendant's lack of criminal history and his strong family support might be mitigating factors; here, they are the opposite. As the Court is aware, it is not uncommon in cases involving child exploitation to have defendants with traumatic upbringings including their own sexual abuse. In this respect, Tennyson is an outlier. As set forth in the PSR, Tennyson grew up as the only child to loving and doting parents where all of his basic needs were met. He had close relationships with his family and generally experienced a positive childhood, free of abuse or neglect.

Additionally, while Tennyson was previously convicted of a sex offense in 2014, he was permitted to plead to a lesser included offense and only received probation, resulting in him accruing only a single criminal history point. Further, as a result of this prior sentence, Tennyson was required to complete sex offender treatment and register as a sex offender. Despite this, Tennyson picked up ten additional charges in 2023 in the Delaware County Case and was on bond when he committed the instant offense.

In other words, Tennyson committed this offense despite every opportunity to live lawfully and, in doing so, showed a deep disregard for the values instilled in him. In deciding to not seek help from his support system or to use the tools provided to him during treatment, Tennyson consciously rejected the advantages for which he was afforded. Similarly, being charged with numerous sex offenses in the Delaware County Case for his conduct with a 13-year-old did not

prompt rehabilitation; instead, only a few short months later, he attempted to arrange meet the 15-year-old in this case for sex while still wearing his ankle monitor.

Thus, considering his relatively advantaged upbringing, the opportunities he was afforded in having already received sex offender treatment, his prior sex offense conviction, and his decision to commit the instant offense while on bond for serious sex offenses, Tennyson's history and characteristics also weigh heavily in favor of a substantial prison term.

2. Promote respect for the law, deterrence, and protect the public.

"I hate the law." That is the response that Tennyson gave when he initially learned that he was arranging a one-night stand with a 15-year-old. Despite this recognition that pursuing his desire to have sex with the teenager would be against the law, Tennyson did not stop there. Instead, Tennyson took steps to subvert the law so that he could still have sex with the minor—just without getting caught. To this end, he set up multiple tests for the minor, requiring her to send numerous photos in different positions and different locations. In doing so, he demonstrated just how resolved he was at getting what he wanted, even if it meant going to great lengths to avoid law enforcement detection, further evidencing the danger he presents to society.

Further, as discussed previously, when Tennyson committed the instant offense, he was not only already a registered sex offender, but he was also on bond in the Delaware County Case for very serious sex crimes against a minor. Thus, in addition to his own words, Tennyson's actions also demonstrate a lack of respect for the law and a clear failure to be deterred.

In his sentencing memorandum, Tennyson points out that this is his first federal offense and suggests that, as a result, a lengthy sentence is not warranted. (Doc. 41, #130). Tennyson goes on to argue that, because he committed a sex offense, he presents a lower chance of recidivism than other categories of defendants because "the shame and humiliation associated with an arrest

10

and the uncovering of private behavior" that is unique to sex offenders itself "tends to result in lower recidivism rates." (*Id*.). Here, Tennyson asserts that the sex offender registration and treatment requirements that will be imposed as a result of this conviction will be sufficient to "reform his conduct, reduce the risk of relapse, and prevent any possibility of recidivism. (*Id*. at 131.).

The government strongly disagrees. Tennyson is a prime example of recidivist. Again, this may be Tennyson's second conviction, but it is his third contact with the criminal justice system for committing sex offenses against minors. At the time Tennyson committed the instant sex offense, he had already been a registered sex offender for nearly ten years. The shame and humiliation associated with that label did not stop him. At the time Tennyson committed the instant sex offense, he had already completed sex offender treatment. The intended rehabilitation of that treatment did not stop him. At the time Tennyson committed the instant sex offense, he was on bond in the Delaware County Case facing pending charges for the hands-on sexual abuse of a minor. The reality of getting caught and the prospect of the significant penalties associated with those charges did not stop him. Finally, even after Tennyson was arrested in this case and held in pretrial custody, Tennyson was caught in the Butler County Jail fulfilling an "order" from another inmate to produce hand-drawn child pornography. Taken together, the government has little to no confidence that anything other than a significant prison term where he has no opportunity to encounter children will keep Tennyson from reoffending.

Tennyson also takes aim with value of general deterrence, arguing that reliance on general deterrence in sentencing is "flawed" due to the "underlying assumption that people weigh rationally the consequences of their behavior." (Doc. 41, #130) (quoting Arthur W. Campbell, Law of Sentencing, § 2.2 (2d ed. 1991)). Here, such a position is undercut by Tennyson's own actions

in the commission of this offense. Indeed, Tennyson's deliberation between his desire to have sex with a minor and the potential consequences he would face if he were caught was on full display. In his messages, Tennyson repeatedly conveyed to the minor the risk he was assuming by arranging their sexual encounter, telling her that "there's so much at stake for me if this goes south" and that he had to be "so cautious" as having sex with her would be "just so dangerous" and that he "would be screwed if anything happened." Thus, contrary to his assertions otherwise, Tennyson demonstrated that people do, in fact, weigh the consequences of their actions; in this case, he simply chose to chance those consequences in order to engage in his desired criminal conduct. Further, the Sixth Circuit has "told sentencing courts *repeatedly*, 'general deterrence is crucial in the child pornography context' to protect the public by deterring the market for such products and activities." *United States v. Schrank*, No. 17-6093, 2019 WL 1716009, at *2 (6th Cir. Apr. 16, 2019) (emphasis in original), citing *United States v. Robinson*, 778 F.3d 515, 520-21 (6th Cir. 2015) (editorial mark omitted); *see also United States v. Bistline*, 720 F.3d 631, 632 (6th Cir. 2013); *United States v. Christman*, 607 F.3d 1110, 1121 (6th Cir. 2010); *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010). Here, Tennyson acted beyond his addiction to child pornography by trying to entice a minor to engage in sexual conduct, highlighting the need for general deterrence of hands-on sex offenders.

In short, Kyle Tennyson is a repeat and dangerous sex offender. From his history, it is unclear what, if anything, will prevent him from reoffending. As such, a significant sentence of incarceration is necessary to deter him and others like him from committing additional sex offenses and to protect the public. Additionally, a significant period of supervised release to follow Tennyson's imprisonment is also necessary to protect society from Tennyson and ensure continued accountability.

3.   Correctional treatment and unwarranted sentencing disparities

A sentence of 151 months' imprisonment also takes into account the need for correctional treatment and to avoid unwarranted sentencing disparities. As previously stated, Tennyson's previously completed outpatient sex offender treatment failed to prevent him from reoffending. Based on his interview with probation, it appears that Tennyson recognizes he needs further treatment. Accordingly, correctional sex offender treatment through the Bureau of Prisons should be a necessary component of Tennyson's sentence.

Finally, while the government's recommended sentence of 151 months' is at the top of the Guideline range, it still within the Guideline range. Courts have routinely recognized that sentencing a defendant within the range recommend by the Guidelines addresses the concern of unwarranted disparities. *See e.g., Gall*, 552 U.S. 38 at 54 (noting that "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges"); *United States v. Wimbley*, 349 F. App'x 54, 58 (6th Cir. 2009) (finding that "the guidelines are designed to avoid unwarranted disparities."). The government's recommended sentence falls at the top of the Guidelines range and, as further detailed above, a Guidelines sentence is appropriate under the all of the 18 U.S.C. § 3553(a) factors.

## **CONCLUSION**

For the foregoing reasons, the United States asks the Court to sentence Tennyson term of imprisonment of 151 months, followed by a significant period of supervised release, a mandatory

$100 special assessment, and a $5,000 special assessment under the Justice for Victims of Trafficking Act of 2015.

Respectfully Submitted,

DOMINICK S. GERACE II
UNITED STATES ATTORNEY

*s/Danielle E. Margeaux*
DANIELLE E. MARGEAUX (OH 98348)
CHRISTY L. MUNCY (KY 88236)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Phone: (513) 684-3711
Danielle.Margeaux@usdoj.gov
Christy.Muncy@usdoj.gov